IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

TAMARA CRISCO,                    )
                                  )
              Plaintiff,          )
                                  )
      v.                          )        1:20CV239
                                  )
KILOLO KIJAKAZI,                  )
Acting Commissioner of Social     )
Security,[1]                      )
                                  )
              Defendant.          )

## MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

Plaintiff Tamara Crisco brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Acting Commissioner of Social Security, denying Plaintiff's claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (Doc. 1.) The court has before it the certified administrative record (cited herein as "Tr. __")[2], as well as the parties'

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted, therefore, for Andrew Saul as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Transcript citations refer to the Administrative Transcript of Record filed manually with the Commissioner's Answer. (Doc. 11.)

cross-motions for judgment, (Docs. 13, 17). For the reasons that follow, the court will enter judgment for Defendant.

I.   **BACKGROUND**

Plaintiff applied for DIB and SSI, alleging a disability onset date of November 26, 2014. (Tr. 321-37.) Upon denial of those applications initially, (Tr. 159-92, 231-36), and on reconsideration, (Tr. 193-230, 241-59), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 260-61). Plaintiff, her non-attorney representative, and a vocational expert ("VE") attended the hearing. (Tr. 106-41.) The ALJ subsequently ruled Plaintiff not disabled under the Act. (Tr. 64-88.) The Appeals Council thereafter denied Plaintiff's request for review, (Tr. 9-14, 320), making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that disability determination, the ALJ made the following findings later adopted by the Commissioner:

> 1.   [Plaintiff] meets the insured status requirements of the . . . Act through December 31, 2017.
>
> 2.   [Plaintiff] has not engaged in substantial gainful activity since November 26, 2014, the alleged onset date.
>
>            . . . .
>
> 3.   [Plaintiff] has the following severe impairments: degenerative disc disease, degenerative joint disease, fibromyalgia, mood disorder, and anxiety disorder.
>
>            . . . .

- 2 -

4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . . .

5. . . . [Plaintiff] has the residual functional capacity to perform light work . . . except she could frequently climb and stoop. She is limited to frequent reaching of the dominant right upper extremity. [She] is capable of simple routine repetitive tasks for two-hour intervals throughout the day for the duration of the workday. She could have no more than occasional interaction with coworkers and supervisors in a stable work environment.

. . . .

6. [Plaintiff] is unable to perform any past relevant work.

. . .

10. Considering [Plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [she] can perform.

. . . .

11. [Plaintiff] has not been under a disability, as defined in the [] Act, from November 26, 2014, through the date of this decision.

(Tr. 70-82 (bold font and internal parenthetical citations omitted).)

## II. <u>LEGAL STANDARD</u>

Federal law authorizes judicial review of the Commissioner's denial of social security benefits. <u>See</u> 42 U.S.C.

- 3 -

§ 405(g); Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the

- 4 -

[ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472 (internal brackets and quotation marks omitted).

In undertaking this limited review, this court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

- 5 -

"The first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990). If a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual function[al] capacity [('RFC')]." Id. at 179.[3]

---

[3] The "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562. The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. The "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63. An ALJ need not discuss every piece of evidence in determining the RFC. See, e.g., Matney v. Colvin, No. 1:09CV229, 2013 WL 1788590, *3 (M.D.N.C. Apr. 26, 2013) (unpublished). What is required is "an accurate and logical bridge from the evidence to [the] conclusion." Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000); Matney, 2013 WL 1788590, at *3.

- 6 -

Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Acting Commissioner] to prove that a significant number of jobs exist which the claimant could perform, despite [the claimant's] impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Acting Commissioner cannot carry her "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[4]

## III. **ANALYSIS**

In Plaintiff's sole issue on judicial review, she challenges the sufficiency of the ALJ's RFC on three grounds.

---

[4] A claimant thus can qualify as disabled via two paths through the five-step sequential evaluation process. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five.

- 7 -

First, she asserts that "[t]he ALJ failed to account for any limitations caused by [Plaintiff]'s migraines in his RFC assessment." (Pl.'s Br. in Supp. of Mot. for Judgment ("Pl.'s Br.") (Doc. 14) at 12[5]; see also Pl.'s Resp. Br. in Supp. of Mot. for Judgment ("Pl.'s Reply") (Doc. 19) at 2-5.) Second, Plaintiff alleges that the ALJ "failed to evaluate how [Plaintiff's] moderate limitation in [the ability to engage in various social interaction activities] would translate into the ability to perform those activities on a consistent basis on even an occasional frequency." (Pl.'s Br. (Doc. 14) at 14; see also Pl.'s Reply (Doc. 19) at 5-8.) Third, Plaintiff maintains that the ALJ "failed to provide a basis for his conclusion that [Plaintiff] can sustain work for two-hour intervals throughout the workday." (Pl.'s Br. (Doc. 14) at 15 (bold font omitted); see also Pl.'s Reply (Doc. 19) at 6-7.) For the reasons that follow, Plaintiff's contentions do not warrant relief.

A. **Migraine Headaches**

According to Plaintiff, her "headache pain is well established by the medical evidence, but unaccounted for in the ALJ's RFC." (Pl.'s Reply (Doc. 19) at 2.) Plaintiff acknowledges

---

[5]    All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

- 8 -

that the ALJ found Plaintiff's migraine headaches a non-severe impairment at step two, (id.; see also Pl.'s Br. (Doc. 14) at 11), but argues that the ALJ "is required to account for all a claimant's impairment[s] – severe and non-severe – in his [RFC] assessment." (Pl.'s Reply (Doc. 19) at 2 (citing Social Security Ruling 96-8p, Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, 1996 WL 374184, at *5 (July 2, 1996) ("SSR 96-8p")).) Although Plaintiff recognizes the ALJ's remark that he "considered" Plaintiff's headaches in the RFC, (Pl.'s Br. (Doc. 14) at 11 (citing Tr. 70)), she maintains that "[a] boilerplate assertion that all impairments have been considered does not suffice; the ALJ must explain [his] evaluation of the impairments' combined effects." (Pl.'s Reply (Doc. 19) at 5 (citing Walker v. Bowen, 889 F.2d 47, 49-50 (4th Cir. 1989), and Reichenbach v. Heckler, 808 F.2d 309, 312 (4th Cir. 1985)).)

SSR 96-8p indeed requires ALJs to consider the impact of all of a claimant's impairments, whether severe or non-severe:

> In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not "severe." While a "not severe" impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may – when considered with limitations or restrictions due to other impairments – be critical to the outcome of a claim. For example, in combination with limitations imposed by an individual's other impairments, the

- 9 -

> limitations due to such a "not severe" impairment may
> prevent an individual from performing past relevant
> work or may narrow the range of other work that the
> individual may still be able to do.

SSR 96-8p, 1996 WL 374184, at *5. Here, the ALJ's decision as a whole explains sufficiently enough to allow for meaningful judicial review how the RFC's limitations to "simple routine repetitive tasks for two-hour intervals throughout the day for the duration of the workday" in a "stable work environment" with "no more than occasional interaction with coworkers and supervisors," (Tr. 73), adequately accounts for Plaintiff's migraine headaches.

First, the ALJ acknowledged Plaintiff's testimony that she experienced migraines lasting for a couple hours starting in late 2015, (see Tr. 73; see also Tr. 117-18), as well as her statements on a Function Report that she has problems with her memory, completing tasks, concentration, understanding, and following instructions, (see Tr. 73; see also Tr. 407), but found Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms not entirely consistent with the medical evidence and other evidence in the record," (Tr. 77), a finding unchallenged by Plaintiff. (See Pl.'s Br. (Doc. 14); Pl.'s Reply (Doc. 19).) In that regard, the ALJ pointed out that Plaintiff "was performing household chores and acting as a caretaker for her mother-in-law and disabled

husband," (Tr. 77 (citing Tr. 794, 806, 808, 810-11)), as well as that she "was hopeful to obtain a job at one point." (Id.; see also Tr. 806, 808.)

Second, the ALJ's discussion of the objective medical evidence further explains the ALJ's consideration of Plaintiff's headaches in the RFC analysis. In that regard, the ALJ noted Plaintiff's reports to treatment providers of headaches in May 2015, (see Tr. 74; see also Tr. 652), and July 2015, (see Tr. 75; see also Tr. 641), as well as her primary care physician's notation of tenderness to palpation in Plaintiff's neck in October 2016. (See Tr. 75; see also Tr. 983.) The ALJ also discussed in detail Plaintiff's neurology consultation for "uncontrolled headaches" with Dr. Francois J. Picot in January 2017, (Tr. 76; see also Tr. 1092-94), including Dr. Picot's finding that Plaintiff had "exquisite tenderness" in her greater occipital nerves bilaterally and Dr. Picot's opinion that Plaintiff's "headaches were multifactorial, including rebound analgesic headaches and excessive caffeine intake." (Tr. 76; see also Tr. 1093.) The ALJ, however, also noted that Plaintiff "was advised to limit her caffeine intake," (Tr. 77; see also Tr. 1093), that an MRI of Plaintiff's head was negative, (see Tr. 77; see also Tr. 1092), that mental status examinations consistently showed intact attention, concentration, and memory,

- 11 -

(see Tr. 77; see also Tr. 769, 771, 773, 775, 777, 779, 781, 790, 792, 798-99, 801-02, 804, 1590), and that Plaintiff passed four online math classes at Stanly Community College from August to December of 2017. (See Tr. 74, 77; see also Tr. 115, 129-30, 791, 794, 797.)

Plaintiff challenges the ALJ's statement that Plaintiff "was advised to limit her caffeine intake," (Tr. 77), by noting that Dr. Picot did not attribute Plaintiff's headaches solely to her caffeine intake. (Pl.'s Br. (Doc. 14) at 12.) Although Plaintiff did not further develop that argument, Plaintiff appears to interpret the ALJ's remark that Dr. Picot advised Plaintiff to limit her caffeine intake to suggest that limiting her caffeine consumption would eradicate her migraines. That challenge falls short, because the ALJ expressly acknowledged Dr. Picot's opinion that Plaintiff's headaches were likely caused by multiple factors, i.e., "multifactorial," (Tr. 70, 76, 77), and explicitly discussed both Plaintiff's use of narcotics and excessive caffeine consumption as causes of her headaches. (See Tr. 76, 77.) Moreover, the other factors Dr. Picot believed could have contributed to Plaintiff's headaches, e.g., cigarette smoking, lack of exercise, lack of sleep, and use of aspartame products, were, like caffeine usage, lifestyle choices that remained within Plaintiff's control to change.

- 12 -

Plaintiff additionally attacks the ALJ's observation that Plaintiff's head MRI was negative, (see Tr. 77), emphasizing that an MRI of the head/brain "is not diagnostic of migraine headaches." (Pl.'s Br. (Doc. 14) at 12.) That argument misses the mark, because Dr. Picot, a neurologist tasked with evaluating Plaintiff's complaint of "[u]ncontrolled headaches," expressly mentioned Plaintiff's negative MRI of the head/brain in his discussion of Plaintiff's medical history, thus indicating that Dr. Picot found that test result relevant to his analysis. (Tr. 1092.) Furthermore, Plaintiff claimed on multiple occasions, including to Dr. Picot, that she began experiencing headaches after a motor vehicle accident during which she sustained a concussion. (See, e.g., Tr. 641, 1092.) Thus, Plaintiff's negative MRI of the head/brain would hold relevance to the question of whether a concussion or other traumatic brain injury contributed to her headaches.

Plaintiff also rejects the notion that the RFC's mental limitations adequately account for her migraine headaches on two grounds. First, she argues that those limitations "disregard[] any time needed away from work due to migraines or absences due to them." (Pl.'s Reply (Doc. 19) at 5.) Plaintiff does not, however, point to any evidence supporting her contention that her migraine headaches would have caused her to need time away

from work or to be entirely absent from work. (See Pl.'s Br. (Doc. 14); Pl.'s Reply (Doc. 19).) The court notes that Plaintiff did not provide any testimony as to the severity or the functional impact of her migraine headaches, stating only that she had experienced migraines since the end of 2015 at a frequency of three to four per month lasting a couple of hours each, and that she took promethazine to relieve them because she was allergic to injections and Maxalt. (See Tr. 117-18, 123-24.) Indeed, Plaintiff did not even include migraine headaches as a disabling impairment on her Disability Report. (See Tr. 364.) Similarly, Function Reports completed by Plaintiff's great aunt and her husband did not mention migraine headaches at all, let alone describe functional limitations arising out of them. (See Tr. 371-78, 410-17.) Furthermore, no treating provider even included migraine headaches as an impairment contributing to her disability, let alone opined that Plaintiff's headaches caused her to suffer any functional limitations. (See Tr. 765, 1328, 1509 (opinions of treating psychiatrist Dr. Nelly Welsch that Plaintiff "[wa]s unable to work due to the severity of her symptoms" of "depression and anxiety"); Tr. 1393 (statement of primary care physician Dr. Victor Lin Ha (who treated Plaintiff's headaches) that Plaintiff's "psychiatric status" impacted her ability to work, and that her "emotional and mental

- 14 -

state" exacerbated her fibromyalgia and osteoarthritis); Tr. 1396 (opinion of Dr. Ha that Plaintiff's "symptoms of depression and anxiety would interfere with her ability to concentrate, handle stressful situations a[nd] work with others," and that "her psychiatric state would prohibit her from being employed").)

Second, Plaintiff notes that the ALJ "did not say" that he included the RFC's mental limitations to account for Plaintiff's migraines and, thus, that this "attempted post hoc rationalization cannot be grounds to affirm." (Pl.'s Reply (Doc. 19) at 5.) Plaintiff is correct that the ALJ did not expressly state that he included those limitations to accommodate Plaintiff's migraine headaches, but he did include those limitations to account for Plaintiff's alleged difficulties understanding and applying information, remembering, concentrating, and paying attention. (See Tr. 77-78 (emphasis added).) Thus, even if the ALJ erred in that regard, any such error remains harmless because, as discussed above, Plaintiff has fallen far short of establishing that the evidence relating to her migraine headaches would have compelled the ALJ to adopt additional restrictions in the RFC. See Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) (observing that "[n]o principle of administrative law or common sense requires us to remand a

- 15 -

case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result").

## B. __Social Interaction__

Plaintiff next contends that "[t]he ALJ said [Plaintiff] could have occasional contact with supervisors and coworkers despite her moderate limitations in social functioning, but he did not explain why he reached that conclusion." (Pl.'s Br. (Doc. 14) at 13 (bold font omitted).)[6] Plaintiff faults the ALJ's handling of Plaintiff's social interaction limitation on two bases, neither of which are persuasive.

First, Plaintiff points out that the ALJ credited the state agency psychological consultants' opinions that Plaintiff "ha[d] moderate limitations in her ability to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers and peers without distracting them or

---

[6] In the ALJ's dispositive hypothetical question to the VE, the ALJ limited Plaintiff to occasional interaction with the public as well as with coworkers and supervisors, (see Tr. 137-39); however, in the RFC, the ALJ restricted Plaintiff only to occasional interaction with coworkers and supervisors. (See Tr. 73.) That discrepancy, whether intentional or unintentional, does not prejudice Plaintiff, because the VE provided (and the ALJ adopted) three jobs available in significant numbers in the national economy that Plaintiff could perform even if she were also limited to occasional interaction with the public. Neither party raised that discrepancy as warranting consideration by the court. (See Pl.'s Br. (Doc. 14); Def.'s Br. (Doc. 18); Pl.'s Reply (Doc. 19).)

exhibiting behavioral extremes, and to work in coordination with or in proximity to others without being distracted by them," (id. (citing Tr. 78-79, 170-71, 186-87, 206, 224)), and found Plaintiff's claimed "difficulty getting along with others and [attempts] to avoid interactions . . . somewhat consistent with the psychiatric notes and mental status examinations documenting irritability and family issues." (Id. (citing Tr. 77).) In light of those findings, Plaintiff deems the ALJ's observation that Plaintiff "was also cooperative with treating providers and maintained good eye contact," (id. 13-14 (citing Tr. 77)), as "insufficient" to explain how Plaintiff could interact occasionally with coworkers and supervisors, because "the ability to get along with a health care provider for a short span of time is not indicative of the ability to get along with coworkers or supervisors over the course of an eight-hour workday and a 40-hour workweek" (id. at 14).

As an initial matter, Plaintiff's argument fails, because the moderate limitations in Plaintiff's abilities to handle instructions/criticism and get along/work with others appear in the portion of the mental RFC form which the state agency psychological consultants used as "merely a worksheet to aid in deciding the presence and degree of functional limitations . . . and d[id] not constitute the RFC assessment," Program Operations

Manual System ("POMS") § DI 24510.060B.2.a (bold font omitted).
(See Tr. 170-71, 186-87, 206, 224.) In accordance with POMS
§ DI 24510.060B.4, the state agency consultants assessed the
actual mental RFC in the narrative portion of the form. (See Tr.
171, 187, 207, 225.) Thus, despite finding moderate limitations
in Plaintiff's abilities to handle instructions/criticism and
get along/work with others, (see Tr. 170-71, 186-87, 206, 224),
the state agency psychological consultants concluded in the
narrative portion of the mental RFC form that Plaintiff remained
capable of "performing [simple, routine, and repetitive tasks]
in a low stress, low social setting." (Tr. 171, 187, 207, 225.)
The ALJ did not err by relying on the consultants' narrative
mental RFC assessment. See Jones v. Comm'r of Soc. Sec., 478
F. App'x 610, 612 (11th Cir. 2012) (rejecting the claimant's
contention that ALJ should have accounted in RFC for moderate
limitations identified on mental RFC assessment form, and noting
that the limitations "are only part of a worksheet that does not
constitute the doctors' actual RFC assessment" (brackets and
internal quotation marks omitted)); Smith v. Comm'r of Soc.
Sec., 631 F.3d 632, 636-37 (3d Cir. 2010) (finding no error
where ALJ did not include in hypothetical question moderate
limitations contained in worksheet part of mental RFC form, and
concluding that the claimant could not "rely on the worksheet

- 18 -

component" of mental RFC form); <u>Johansen v. Barnhart</u>, 314 F.3d 283, 288-89 (7th Cir. 2002) (upholding ALJ's reliance on narrative mental RFC assessment rather than subsidiary findings of moderate limitations in the claimant's ability to maintain a regular schedule and attendance and to complete a normal workday and workweek); <u>Graham v. Saul</u>, No. 1:18CV403, 2019 WL 3767041, at *12 (M.D.N.C. Aug. 9, 2019) (concluding that ALJ "did not err by relying on [the state agency consultant's] narrative mental RFC assessment" because the check-box portion of the form constituted "merely a worksheet to aid in deciding the presence and degree of functional limitations," and "state agency consultants assess the actual mental RFC in the narrative portion of the form" (citing POMS §§ DI 24510.060B.2.a and 24510.060B.4)), <u>recommendation adopted</u>, No. 1:18-CV-403, 2019 WL 5783543 (M.D.N.C. Sept. 3, 2019).[7]

---

[7] Although the ALJ accorded "partial weight" to the state agency psychological consultants' opinions, (<u>see</u> Tr. 78-79), he explained that he found the consultants' limitation to "a low stress, low social setting" vague. (<u>See</u> Tr. 79.) Thus, the ALJ <u>fully</u> credited only the consultants' opinion that Plaintiff remained capable of performing simple, routine, and repetitive tasks; however, the ALJ also included restrictions to a "stable work environment" and to "no more than occasional interaction with coworkers and supervisors," (Tr. 73), which nevertheless accounts for the consultants' limitation to "a low stress, low social setting."

- 19 -

Plaintiff's challenge to the ALJ's observation that Plaintiff "was also cooperative with treating providers and maintained good eye contact," (Pl.'s Br. (Doc. 14) at 13-14 (citing Tr. 77)), fares no better. While isolated references to a cooperative demeanor and/or good eye contact might not provide substantial evidence to support the ALJ's limitation to occasional interaction, in this case, the record is replete with descriptions of Plaintiff as cooperative and as having good eye contact and a normal mood and affect, over the course of more than three years of medical treatment. (See Tr. 587, 598, 606, 615, 624, 631, 645, 665, 771, 777, 779, 781, 790, 798-99, 801-02, 804, 923, 983, 1014, 1045, 1093, 1172, 1230, 1264, 1304, 1327, 1355, 1435, 1590.) Such a consistent record of stable, cooperative interactions holds relevance to whether Plaintiff can interact occasionally with others.

Moreover, the ALJ did not rely solely on his observation regarding Plaintiff's cooperative demeanor and good eye contact in evaluating her ability to interact with others. Significantly, the ALJ noted Plaintiff's statements that she had difficulties getting along with others and tried to avoid interacting with others, (Tr. 73-74), but found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [were] not entirely consistent with

the medical evidence and other evidence in the record," (Tr. 77), a finding that Plaintiff did not contest. (See Pl.'s Br. (Doc. 14); Pl.'s Reply (Doc. 19).) The ALJ also noted that Plaintiff "has not lost a job due to problems getting along with others" and "reported social activities involving visiting with her aunt a couple times a week," (Tr. 72), as well as that Plaintiff was "taking care of her disabled husband and mother-in-law," (Tr. 78).

Second, Plaintiff argues that "the ALJ failed to explain how moderate limitations in interacting with others translates into the ability to perform those activities on a consistent basis even if only occasionally," and asserts that "[m]oderate does not mean occasional." (Pl.'s Reply (Doc. 19) at 6; see also id. at 7 (highlighting evidence Plaintiff believes shows she cannot "'occasionally' (up to a third of a workday) be around people on a sustained basis"); Pl.'s Br. (Doc. 14) at 14.) Plaintiff deems the ALJ's failings in this regard "significant," because "the ability to interact with supervisors appropriately to accept instructions and respond appropriately to criticism is critical to the performance of unskilled work." (Pl.'s Reply (Doc. 19) at 7 (citing Social Security Ruling 85-15, Titles II and XVI: Capability to Do Other Work – The Medical-Vocational Rules as a Framework for Evaluating Solely Nonexertional

- 21 -

Impairments, 1985 WL 56857 (1985) ("SSR 85-15"), and POMS § DI 25020.010B.2).)

Plaintiff's argument that her moderate limitation in interaction does not equate to an ability to interact occasionally on a consistent or sustained basis misses the mark. The regulations expressly define a "moderate" limitation in interaction as a "fair" ability to interact "independently, appropriately, effectively, and on a sustained basis," 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00F.2.c (emphasis added). Significantly, many district courts in the Fourth Circuit have found that RFC restrictions to occasional interaction with others accommodate moderate limitations in social interaction. See, e.g., Corvin v. Berryhill, Civil No. 5:17CV92-RJC-DSC, 2018 WL 4677887, at *3 (W.D.N.C. Feb. 7, 2018) ("The limitation to 'occasional exposure to people' adequately accounts for moderate difficulties in social functioning."), recommendation adopted, No. 5:17-cv-92-RJC-DSC, 2018 WL 3738226 (W.D.N.C. Aug. 7, 2018) (unpublished); Darby v. Berryhill, No. 1:16-cv-00366-RJC, 2018 WL 310136, at *7 (W.D.N.C. Jan. 5, 2018) ("As for the meaning of 'occasional interpersonal interactions,' the [c]ourt maintains that the phrase means exactly what it says: occasional — as opposed to regular —interpersonal interactions."); Tanner v. Colvin, No. 4:15-CV-27-FL, 2016 WL 626493 (E.D.N.C. Jan. 26.

- 22 -

2016) (finding occasional exposure to people adequately accounted for moderate limitation in interaction), recommendation adopted, No. 4:15-CV-27-FL, 2016 WL 617431 (E.D.N.C. Feb. 16, 2016).

In addition, Plaintiff's argument that "occasional" interaction could still be more "consistent" or "sustained" than Plaintiff's moderate limitation in interaction would allow is further foreclosed by consideration of the interaction requirements of the jobs the VE found Plaintiff could still perform at step five. Based on the VE's testimony, the ALJ concluded that, considering Plaintiff's age, education, work experience, and RFC, she remained able to perform the jobs of production assembler, agricultural produce sorter, and routing clerk. (See Tr. 82; see also Tr. 136-38.) The Dictionary of Occupational Titles ("DOT") listings for those jobs rates the requirements of "Taking Instructions-Helping" as "Not Significant" and "Talking" as "Not Present." DOT, No. 706.687-010 ("Assembler, Production"), 1991 WL 679074 (G.P.O. 4th ed. rev. 1991); DOT, No. 529.687-186 ("Sorter, Agricultural Produce"), 1991 WL 674781; DOT, No. 222.687-022 ("Routing Clerk"), 1991 WL 672133. Moreover, the DOT code for all three jobs contains a fifth digit of "8," reflecting the lowest possible level of human interaction that exists in the labor

- 23 -

force. See DOT, App'x B, 1991 WL 688701; see also Cobb v.
Colvin, No. 2:13cv115 TCM, 2014 WL 6845850, at *19 (E.D. Mo.
Dec. 3, 2014) ("As defined in the DOT, the level of interaction
designated for the[se] job[s] . . . is 'not significant' and is
rated at a Level 8. . . . This designated level of interaction
is compatible with an RFC limiting a claimant to only occasional
contact with coworkers, supervisors, and the public." (internal
citations omitted)).

C. **Concentration, Persistence, or Pace**

Lastly, Plaintiff contends that "[t]he ALJ did not explain
upon what evidence he based his conclusion that [Plaintiff]
could perform [simple, routine, and repetitive] tasks 'for two-
hour intervals throughout the day for the duration of the
workday.'" (Pl.'s Br. (Doc. 14) at 15 (quoting Tr. 73); see also
Pl.'s Reply (Doc. 19) at 6-7.) According to Plaintiff,
"[t]estimonial evidence supports that . . . she is unable to
complete tasks in a timely manner, takes rest breaks throughout
the day, and performs relatively minimal daily activities."
(Pl.'s Br. (Doc. 14) at 15 (citing Tr. 371-78, 402-09, 410-17).)
Plaintiff additionally points out that the ALJ "appear[ed] to
credit" the state agency psychological consultants' opinions
that Plaintiff "was moderately limited in her ability to
maintain attention and concentration for extended periods, and

- 24 -

to complete a normal workday and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (Id. at 13, 16 (citing Tr. 78-79, 170, 186-87, 206, 224).) Plaintiff further observes that the VE "testified that if an individual was not capable of sustained work functions for two-hour intervals throughout the day for the duration of the workday on a consistent basis, no competitive employment could be sustained or maintained." (Id. at 17 (citing Tr. 139).)

Contrary to Plaintiff's assertion that the ALJ fashioned the RFC limitation to simple, routine, and repetitive tasks for two-hour intervals "out of whole cloth," (id. at 16), the court can discern the basis for the ALJ's reasoning. Another court in this district has previously recognized that a standard, eight-hour workday requires an individual to perform work tasks in two-hour blocks of time:

> Social Security R[uling] ("SSR") 96-9p, [Policy Interpretation Ruling Titles II and XVI: Determining Capability to Do Other Work – Implications of a Residual Functional Capacity for Less Than a Full Range of Sedentary Work, 1996 WL 374185 (July 2, 1996) ("SSR 96-9p")] . . . provides a guideline for customary breaks during a workday as follows: ". . . a morning break, a lunch period, and an afternoon break at approximately 2-hour intervals." Thus, customary breaks or "normal breaks," would reasonably occur approximately every two hours.

<u>Hawley v. Astrue</u>, No. 1:09CV246, 2012 WL 1268475, at *7
(M.D.N.C. Apr. 16, 2012) (quoting <u>Perkins v. Astrue</u>, No. EDCV-
08-1383-OP, 2010 WL 375117, at *6-7 (C.D. Cal. Jan. 25, 2010)
(internal quotation marks, citation, and footnote omitted)),
<u>recommendation adopted</u>, No. 1:09CV246, 2012 WL 3584340 (M.D.N.C.
Aug. 20, 2012). Thus, the ALJ determined that Plaintiff could
perform work for those standard, two-hour blocks of time,
despite moderate limitation in concentration, persistence, or
pace, so long as the work involved simple, routine, and
repetitive tasks in a stable work environment with no more than
occasional interaction with coworkers and supervisors.

Furthermore, the ALJ's decision adequately explained how
the mental restrictions in the RFC adequately accounted for
Plaintiff's moderate limitation in concentration, persistence,
or pace. The ALJ acknowledged Plaintiff's statements that she
had difficulty remembering, completing tasks, concentrating,
understanding, and following instructions, (<u>see</u> Tr. 73), but
then, as discussed above, found that her "statements concerning
the intensity, persistence and limiting effects of [her]
symptoms [were] not entirely consistent with the medical
evidence and other evidence in the record," (Tr. 77). Plaintiff
did not contest that finding. (<u>See</u> Pl.'s Br. (Doc. 14); Pl.'s
Reply (Doc. 19).) The ALJ also discussed Plaintiff's mental

health treatment in fair amount of detail, (see Tr. 74-76), and
provided the following analysis to support the mental RFC:

> [Plaintiff] testified that she passed four
> prerequisite math classes for a medical assistant
> online community college program, but that she stopped
> taking classes because she was not able to handle it.
> However, in psychiatric notes, she reported that she
> was doing well in her classes and she reported only
> using Xanax "when really needed." . . . [Plaintiff]
> alleged deficits in memory, concentration, and in her
> ability to pay attention; however, her mental status
> exams noted intact recent and remote memory, or
> generally intact memory, and intact attention and
> concentration. She had periods of circumstantial
> thought process without looseness of association. The
> alleged deficits in these functional areas are not
> reflected in the treating notes. Moreover, there are
> no documented deficits in insight, judgment, or
> decision-making.

> Therefore, considering [Plaintiff]'s testimony
> and Function Report, as well as the aforementioned
> treating notes, the undersigned finds that [Plaintiff]
> is capable of simple routine repetitive tasks for two-
> hour intervals throughout the day for the duration of
> the workday. . . . These limitations are consistent
> with her apparent ability to pass four online math
> courses . . . .

(Tr. 77-78 (internal parenthetical citations omitted).)

Finally, in determining Plaintiff's mental RFC, the ALJ credited

the state agency psychological consultants' opinions that,

despite moderate limitation in concentration, persistence, or

pace, (see Tr. 165, 182, 201, 219), Plaintiff was capable of

"performing simple tasks." (Tr. 171, 187, 207, 225.) (See Tr.

78-79.)[8] The ALJ has thus created a "logical bridge," see <u>Monroe</u> <u>v. Colvin</u>, 826 F.3d 176, 189 (4th Cir. 2016), between the record evidence and his conclusion that Plaintiff can perform simple, routine, and repetitive tasks for two-hour intervals in a stable work environment with no more than occasional interaction with coworkers and supervisors, notwithstanding moderate limitation in concentration, persistence, or pace, and remand is not warranted on that basis.

In sum, Plaintiff's first and only issue on review fails to entitle her to relief.

## IV. <u>CONCLUSION</u>

Plaintiff has not established an error warranting remand.

**IT IS THEREFORE ORDERED** that the Commissioner's decision finding no disability is **AFFIRMED**, that Plaintiff's Motion for a Judgment Reversing or Modifying the Decision of the Commissioner

---

[8] As discussed above, and contrary to Plaintiff's argument, the ALJ did not "credit" the state agency psychological consultants' findings that Plaintiff had moderate limitations in her abilities to maintain attention and concentration for extended periods, and to complete a normal workday and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods," (Tr. 78-79, 170, 186-87, 206, 224), as those findings appear in the portion of the mental RFC form which the consultants used as "merely a worksheet to aid in deciding the presence and degree of functional limitations . . . and d[id] not constitute the RFC assessment," POMS § DI 24510.060B.2.a (bold font omitted).

- 28 -

of Social Security or Remanding the Cause for a Rehearing, (Doc. 13), is **DENIED**, that Defendant's Motion for Judgment on the Pleadings, (Doc. 17), is **GRANTED**, and that this action is **DISMISSED WITH PREJUDICE.**

A Judgment dismissing this action will be entered contemporaneously with this Order.

This the 27th day of September, 2021.

_____
United States District Judge